STATE OF MAINE
KENNEBEC, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-99-64
DHM-KEN -6/5/2000

ROBERT DAVIDSON,

    Petitioner

    v.

MAINE STATE RETIREMENT SYSTEM,

    Respondent

DECISION AND ORDER

This matter is before the court on petitioner's M.R. Civ. P. 80C appeal of the respondent's March 11, 1999 decision affirming the decision of the Executive Director to cease paying him disability benefits based on a finding that he can now engage in substantial gainful activity.

I.    Facts and Procedural History

Petitioner Davidson began receiving disability retirement benefits from the respondent, Maine State Retirement System (System), in February, 1991 on the basis of his heart disease. On September 8, 1997, the System's Medical Board reviewed Davidson's case and determined that he was capable of doing sedentary work up to 40 hours a week. R. at 1.63-1.64. Davidson was notified that his benefits would be discontinued as soon as he became employed and that his benefits would continue while he was looking for work only if he demonstrated on a monthly basis that he was actively seeking work. R. at 1.5. Davidson appealed this decision. R. at 1.4. He submitted additional medical information which the Medical Board reviewed on

May 21, 1998.  R. at 21.1.  On June 1, 1998 the Chief Deputy affirmed the September 8, 1997 decision of the Medical Board.  R. at 21.1-21.2.

A hearing on Davidson's appeal was scheduled for October 1, 1998.  Prior to the hearing, on July 29, 1998, the System submitted to the hearing officer and Davidson the testimony of Philip Amoroso, the System's vocational expert.  R. at 26.1-26.39.  On September 28, 1998, Davidson's counsel filed a motion in limine to exclude Amoroso's testimony.  R. at 29.1-29.4.  The motion was denied both prior to hearing and at the hearing when counsel renewed the motion.  R. at 39.2.  The hearing was held as scheduled, R. at 30.1-30.41, and afterwards, the parties were given the opportunity to file "position papers."  R. at 31.1.  On February 1, 1999, the hearing officer issued a recommended decision and the parties were given the opportunity to file comments, which Davidson did.  R. at 34.1; 35.1.  The hearing officer responded to those comments, R. at 37.1, and Davidson was notified that the recommended decision would be considered by the Board of Trustees (Board) at their next meeting on March 11, 1999.  R. at 45.1.  This notification stated that Davidson would be notified prior to March 11, 1999 as to the approximate time his case would be considered.  *Id.*  Davidson and his counsel were called on March 10, 1999 by an Appeals Clerk.  R. at 38.1.  The record reflects that these phone calls were made to see if they would be attending the meeting and they indicated that they would not.[1]  *Id.*  Davidson and his counsel did not attend the Board's meeting.  *Id.*

---

[1] Davidson asserts that these phone calls were made to notify them that the Board would consider the case at 11:00 a.m.  In support of this claim, he cites to pages 38.1 and 40.2 of the record.  However, nothing on page 38.1 supports this assertion and page 40.2 is a page of a memorandum written by Davidson's counsel requesting the Board to reconsider its decision to accept the hearing officer's

2

The Board issued its decision affirming the Chief Deputy Director's decision that Davidson was capable of engaging in substantial gainful activity. Davidson then filed this Rule 80C appeal in which he asserts several claims of error.

## II.    Discussion

### A.    Standard of Review

When the decision of an administrative agency is appealed pursuant to M.R. Civ. P. 80C, this Court reviews the agency's decision directly for abuse of discretion, errors of law, and findings not supported by the evidence. *Centamore v. Dep't of Human Servs.*, 664 A.2d 369, 370 (Me. 1995). In reviewing the decisions of an administrative agency, the Court should "not attempt to second-guess the agency on matters falling within its realm of expertise" and the Court's review is limited to "determining whether the agency's conclusions are unreasonable, unjust or unlawful in light of the record." *Imagineering v. Superintendent of Ins.*, 593 A.2d 1050, 1053 (Me. 1991). The focus on appeal is not whether the Court would have reached the same conclusion as the agency, but whether the record contains competent and substantial evidence which supports the result reached by the agency. *CWCO, Inc v. Superintendent of Ins.*, 1997 ME 226, ¶6, 703 A.2d 1258, 1261. "A party seeking review of an agency's findings must prove they are unsupported by *any* competent evidence." *Maine Bankers Ass'n v. Bureau of Banking*, 684 A.2d 1304, 1306 (Me. 1996) (emphasis added).

> The fact that the record contains inconsistent evidence or that inconsistent conclusions could be drawn from the record does not

recommended decision.

3

prevent the agency's findings from being sustained if there is substantial evidence to support them . . . This court will not substitute its judgment for [the System's] where there may be a reasonable difference of opinion.

*Clarke v. Maine Unemployment Ins. Comm'n*, 491 A.2d 549, 552 (Me. 1985) (quoting *Seven Islands Land Co. v. Maine Land Use Regulation Comm'n*, 450 A.2d 475, 479 (Me. 1982)). When an agency finds that the party with the burden of proof has failed to meet that burden, the court can reverse that determination "only if the record compels a contrary conclusion to the exclusion of any other inference." *Hale-Rice v. State Retirement Sys.*, 1997 ME 64, ¶ 17, 691 A.2d 1232, 1237 (quoting *Douglas v. Board of Trustees*, 669 A.2d 177, 179 (Me. 1996)).

**B.     Did the Board err in failing to exclude Philip Amoroso's expert testimony?**

Davidson argues that the hearing officer committed legal error by not excluding the testimony of Amoroso because his testimony as an expert was not sufficiently reliable under the standards announced in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 570 (1993) and *State v. Williams*, 388 A.2d 500 (Me. 1978), and because his expertise was fatally compromised by his employment by the System. Regarding Davidson's first claim, Maine's Administrative Procedures Act has the following provisions governing the admissibility of evidence in administrative hearings:

**1. Rules of privilege.** Unless otherwise provided by statute, agencies need not observe the rules of evidence observed by courts, but shall observe the rules of privilege recognized by law.

**2. Evidence.** Evidence shall be admitted if it is of the kind of evidence upon which reasonable persons are accustomed to rely in the conduct

4

of serious affairs.    Agencies may exclude irrelevant or unduly repetitious evidence.

5 M.R.S.A. § 9057(1), (2) (1989).  Although Davidson acknowledges that the Rules of Evidence are inapplicable to administrative hearings, he argues that constitutional substantive due process considerations must still be complied with in determining whether evidence is admissible under section 9057(2).  In assessing whether those constitutional considerations have been complied with, Davidson argues that cases addressing the admission of expert testimony under Rule 702 may be referred to by this court for guidance.  He relies primarily on the requirements announced by the Supreme Court in *Daubert*, and argues that Amoroso's testimony does not meet these requirements because Amoroso is biased as the result of the fact that he has worked many years for and is paid by the System.

Davidson's reliance on *Daubert* and *Williams*, which interpret Rule 702 of the Maine and Federal rules of evidence, is misplaced.  Neither of those cases address the constitutional standards for the admissibility of expert evidence - rather they focus solely on Rule 702.  In *Daubert*, the case Davidson primarily relies on, the Court does not mention the Constitution.  The Court's entire focus is on what Rule 702 requires in order to admit expert testimony.  *See Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994) (noting that *Daubert* does not "purport[] to set a constitutional floor on the admissibility of scientific evidence").  Davidson's reliance on these Rule 702 cases is misplaced, not only because none of the cases address constitutional requirements for admitting expert testimony, but also because the rules of evidence are inapplicable in administrative hearings and so case law interpreting Rule 702 is

5

irrelevant to the inquiry of whether the hearing officer erred in admitting Amoroso's testimony.

The admission of Amoroso's testimony did not violate Davidson's right to due process. In an administrative hearing such as the one in the instant case, "[t]he only restrictions imposed on the truth-seeking function are those required by due process, of which the touchstone is fundamental fairness." *Ingerson v. State*, 491 A.2d 1176, 1184 (Me. 1985). In *Ingerson*, the Law Court was presented with a situation in which a police detective testified at a parole revocation hearing as to his opinion of an alleged victim's truthfulness regarding her account of the rape Ingerson allegedly committed. *Id.* The Court found that the admission of the detective's opinion did not violate due process. *Id.* at 1184-85. In reaching this conclusion, the Court noted that the detective was present at the parole hearing so that he could be questioned on both direct and cross-examination regarding the basis for his opinion. *Id.* at 1184. Additionally, the Court found that there was no risk of the detective's testimony "overaw[ing]" the Parole Board as the Board "has a long experience of hearing the testimony of police officers, and was unlikely to accord [the detective's] opinion any undue weight based on his opinion." *Id.* These same factors support the admission of Amoroso's testimony. Not only was Amoroso present at the hearing and available for questioning on both direct and cross-examination, but hearing officers, such as the one engaged in this case, are accustomed to hearing the testimony of vocational experts and thus, are unlikely to

6

accord their testimony any undue weight. This court finds that Davidson's right to due process was not violated as a result of the admission of Amoroso's testimony.

Moreover, Amoroso's testimony meets the standard in 5 M.R.S.A. § 9057(2) (1989) which governs the admissibility of evidence in administrative hearings. That section provides that "[e]vidence shall be admitted if it is of the kind of evidence upon which reasonable persons are accustomed to rely in the conduct of serious affairs. Agencies may exclude irrelevant or unduly repetitious evidence." *Id.* This rule is also incorporated into Me.S.Ret. Sys. R. ch. 702, § 11(A). In noting this specific provision of the rules, the Law Court has found that "[t]he rules favor the liberal admission of all relevant evidence." *Hale-Rice*, 1997 ME 64, ¶ 13, 691 A.2d at 1236. The rules further provide that "[t]he fact that evidence is admitted shall not limit the authority of the hearing officer to determine the weight to be given the evidence." Me.S.Ret. Sys. R. ch. 702, § 11(E).

While Amoroso's testimony could be considered suspect because of his employment by the System, this factor goes towards the *weight* to be given the testimony, not whether it should be admissible. Davidson had the opportunity to cross-examine Amoroso and to bring in a vocational expert that he hired to testify in his favor. The Board was free to disregard Amoroso's testimony or to give it limited weight considering the testimony Davidson elicited from him during his cross-examination. Me.S.Ret. Sys. R. ch. 702, § 11(E). Considering Amoroso's experience and credentials, R. at 26.2-26.3, his testimony easily qualifies as "the kind of evidence upon which reasonable persons are accustomed to rely in the conduct of serious

7

affairs." 5 M.R.S.A. § 9057(2). It was not error for the Board to admit and rely on Amoroso's testimony in rendering its decision.[2]

## C. Did Amoroso err in finding that Davidson can perform full-time employment from the beginning of his employment?

Davidson argues that if Amoroso's testimony was properly admitted, it should have been given no weight because he improperly assumed that he could perform full-time work from the beginning of his employment, even though his treating physician indicated that if he did return to work, he should do so initially on a part-time basis. This argument mischaracterizes the evidence and Amoroso's testimony. Amoroso gave the following testimony regarding Davidson's ability to engage in full-time employment:

Q:    Okay. Did you assume in this process that Mr. Davidson would be able physically to perform full-time work from the beginning of his employment?

A:    I gathered that from the -- from the medical records, yes.

R. at 30.34. It is clear from this testimony that Amoroso's "assumption" was based his review on the medical records. Thus, the issue is whether the medical records support Amoroso's conclusion that Davidson would be able to work full-time from the beginning of his employment. Davidson relies on a report from his treating physician, Dr. Childs, dated November 20, 1995, as evidence that he should begin with part-time employment. Dr. Childs stated: "I see no reason why [Davidson] would not be able to work a 40 hour week, however, it might be appropriate to start

---

[2] In Law Court found in *Ingerson* that "[t]he opinion of a police detective falls into that category of evidence" which is admissible under section 9057(2). 491 A.2d at 1185. If a detective's opinion is admissible under section 9057(2), even though the detective is paid by the State, there is no basis for excluding the testimony of Amoroso because he is paid by the System.

him part-time and increase from there." R. at 1.88. Thus, Dr. Childs does not say that Davidson should start part-time, rather, she only stated that it *might* be appropriate for him to do so. In a recent questionnaire, Dr. Childs was asked to list any physical or mental limitations that his heart disease causes which impair his ability to work. Dr. Childs did not mention any limitation on Davidson's ability to perform full-time work. *See* R. at 1.13. The Medical Board concluded based on its review of the medical evidence that Davidson could work in a sedentary position for up to 40 hours a week. R. at 1.64. The rehabilitation counselor Davidson saw at Comprehensive Rehabilitation Associates indicated that Davidson "appears capable of working a forty hour week with restrictions." R. at 1.74; *see also* R. at 1.82 ("Dr. Childs indicates that Mr. Davidson is not restricted from full-time employment . . .").[3] Davidson has not cited any evidence, other than Dr. Childs' November 20, 1995 report, which supports his claim that he must begin employment on a part-time basis. Moreover, to the extent that he could cite such evidence, it would do nothing but provide inconsistent evidence on this issue. Inconsistent evidence does not render an agency's decision incorrect and this court cannot substitute its opinion for that of the agency where there may be a reasonable difference of opinion. Amoroso's "assumption" that Davidson could engage in full-time work from the

---

[3] The rehabilitation counselor also states that "work hardening with part-time employment in an office environment seems appropriate and reasonable." R. at 1.82. However, inconsistent evidence in the record does not render an agency's decision incorrect.

9

beginning of his employment is supported by the medical evidence in the record and therefore, does not provide a basis for discounting his testimony.[4]

**D. Did the Board err in finding that the six recommended jobs are consistent with Davidson's training, education or experience?**

The Board found that both Davidson and Amoroso agreed that Davidson does not have direct experience or training in any of the six recommended jobs. Davidson argues that because he does not have any direct experience or training, those jobs are not consistent with his training, education or experience. He notes that Amoroso concluded that he "could be trained to do any of those jobs." Pet's Brief at 13 (quoting R. at 39.4). Davidson argues that if he needs to be trained to perform a particular job, then that job cannot be consistent with his training, education or experience. He notes that the Retirement System Rules provide that a job is consistent with a claimant's training, education or experience when that job bears "a logical relationship" to his/her previous training, education or experience, and that such a relationship requires "possession of appropriate training in relevant skills and knowledge." He argues that since Amoroso agrees that he would have to be trained to do the recommended jobs, he does not possess appropriate training in

---

[4] The Board considered this issue regarding Davidson's ability to perform full-time work at the beginning of his employment. The Board first noted:

> Appellant testified that he can only do part-time work. Appellant's primary care physician, Dr. Childs, stated that she saw no reason why he could not work a 40 hour week, but that it might be appropriate to start him part-time and increase from there. The Medical Board indicated 40 hours was appropriate and light amounts of stress should be tolerable in a sedentary 40 hour a week occupation. . . . The evidence demonstrates that Mr. Davidson should be able to handle normal levels of stress in an office job and that he is able to work full time, although a work hardening period might be helpful to him. Such a work hardening period with part-time employment is not inconsistent with the medical evidence that Mr. Davidson is able to work a 40 hour work week.

R. at 39.4, 39.5.

10

relevant skills and knowledge such that a logical relationship to his previous training, education or experience can be established.

In order to receive disability benefits from the System, a claimant's disability "must render the person unable to engage in any substantial gainful activity that is consistent with the person's training, education or experience." 5 M.R.S.A. § 17929(2)(B) (Supp. 1999). The Retirement System Rules provide guidance in determining whether an activity is consistent with the claimant's training, education or experience. They state:

(1) "Consistent with" means that the activity or activities must bear a logical relationship to the person's previous training, education or experience.
(2) Such a relationship is demonstrated by the possession of appropriate training in relevant skills and knowledge, including those that are transferable; or appropriate type and level of education; or appropriate experience.

Me.S.Ret. Sys. R. ch. 507, § 1(C). Thus, according to the rules, it is not necessary that a claimant have "appropriate training in relevant skills and knowledge" if he or she has "transferable" skills and knowledge. The Board found that Davidson has "transferable skills that are needed to perform the specified jobs," noting Amoroso's testimony that the "specified jobs are consistent with Appellant's training, education or experience." R. at 39.4. Considering Davidson's work history, as documented in the record, this conclusion is supported by the record. Davidson served twenty years in the military. R. at 30.5. For the first eight years, he worked in the Army as a radio operator. He described this position as a "Morse code operator, telegrapher and as things progressed it went into radio teletype and then into radio." R. at 30.7.

11

Following a year where he was not in the service, he reenlisted in the Air Force as a radio frequency management technician. R. at 30.8. This position required one year of training, six months in school and six months of on-the-job training. R. at 30.8, 30.20. Davidson described his duties in this position as follows:

> The lower echelon bases they needed a license to turn their radios on and they had to get their license from the Department of the Army, Air Force, whatever and I was a go-between like a coordinator between all the small bases, I had 100 bases under me and I reviewed their paperwork and forwarded it to whichever branch of the service if it complied with our regulations.

R. at 30.8. *See* R. at 30.20-30.21 for more information regarding his duties in this position. Following his retirement from the military, he ran his own furniture repair and refinishing business for five years. R. at 30.9. After that, he worked as a corrections officer which involved direct care of the inmates, transporting them to work sites, scheduling appointments for the inmates, and some paperwork. R. at 1.76; 30.9-30.11. He also worked part-time as a deputy sheriff where he did patrol work, paperwork for the sheriff's department, and served civil summons. R. at 30.9-30.10. He has completed two years of college education and has recently taken three computer classes. R. at 1.76; 30.5-30.6; 30.19. Considering this work history and comparing it to the job descriptions of the recommended jobs, R. at 26.7-26.18, the record supports a finding that Davidson has transferable skills, including the ability to perform basic computer operations, process paperwork, review and process applications, work with people,[5] keep records, follow directions, and work without

---

[5] Davidson argues that there is no evidence in the record to support a finding that he has good interpersonal and communication skills. Pet's Brief at 16-18. In fact, Davidson's rehabilitation counselor noted that he has "good social skills." R. at 1.76.

12

supervision. Consequently, the Board's finding that Davidson has transferable skills making the recommended jobs consistent with his training, education or experience is supported by the record and petitioner's argument to the contrary is without merit.

### E. Did the Board err in finding that the six recommended jobs comply with Davidson's medical restriction to avoid high degrees of stress?

Davidson raises two objections to the Board's conclusion that the six recommended jobs comply with his medical restriction to avoid high degrees of stress. First, he challenges the Board's finding that the jobs identified do not indicate "above normal" stress levels such that his medical restriction to avoid high degrees of stress does not come into play. He notes that the Medical Board found that due to his heart condition, he should not be subjected to high degrees of stress and that the level of stress imposed by any job must be viewed from his perspective. He then argues that the Board improperly concluded that the recommended jobs would not cause him excessive stress in the absence of actual testimony from him on this subject and in the absence of any objective evidence that the particular jobs do not, in fact, create excessive stress in him.

Under the Retirement System Rules, "[t]he recipient of disability benefits has the ultimate burden of demonstrating that s/he is unable to engage in substantially gainful activity." Me.S.Ret. Sys. R. ch. 507, § 2(A); *see also Hale-Rice*, 1997 ME 64, ¶ 17, 691 A.2d at 1237. Thus, it was Davidson's burden to show that the recommended jobs were not in compliance with his medical restrictions because they would have caused him excessive stress. The court has been unable to locate any evidence in the

13

record which would support a finding that the recommended jobs would cause Davidson undue stress. Not only did Davidson fail to offer any testimony regarding the stress he thought those particular jobs might cause him, he also failed to provide any evidence regarding what sort of things might cause him stress generally. *See* R. at 30.3-30.22. Thus, the record is devoid of any evidence regarding what causes Davidson to experience stress. On the other hand, Davidson did testify that he thought he could perform office-type work[6] and his treating physician recommended this type of work as being suitable for him.[7] The Board's conclusion that the recommended jobs would not create above normal stress levels was not error because Davidson failed to offer any evidence showing that those jobs would cause him elevated levels of stress.

Davidson's second challenge to the Board's conclusion that the recommended jobs comply with his medical restrictions focuses on the fact that each of the jobs,

---

[6] Specifically, Davidson testified about his participation, at the request of the System, in a vocational rehabilitation program through Comprehensive Rehabilitation Associates. Regarding this rehabilitation program, Davidson testified as follows:

Q: Was there a particular type of employment that you and he had targeted that you were looking to gain?
A: No, just about anything that would fall into my category that I could do, you know.
Q: And what did you think that was that you could do?
A: General office-type work.

R. at 30.15. Thus, by Davidson's own testimony, he thinks he could perform office-type work and from this, it could be inferred that he does not think this type of work would be particularly stressful for him to perform.

[7] Davidson argues that Dr. Childs' statements about his ability to perform office-type work are in conflict and that the Board failed to resolve this conflict. *See* Pet's Brief at 14-15. Review of Dr. Childs' statements reveal that she believes that office-type work is appropriate for him considering his physical condition. *See* R. at 1.33 ("I feel that a normal rigorous office setting would be fine for him and that he would not be restricted from that type of work."); 1.34 ("I feel that routine office type work, although may be stressful, could be suitable for him.").

14

except payroll and timekeeping clerk, involve one or more factors which he asserts the Medical Board found should be avoided because of the stress they can generate. Regarding the payroll and timekeeping position, he argues that elevated stress levels can be expected because of the accuracy and speed requirements set forth in that job's description. Thus, Davidson concludes that the recommended jobs are not consistent with his work restriction of avoiding stress.

The Medical Board found that "[c]ertainly, confrontations with clients, repeated telephone calls and messages which put undo anxiety and stress on an individual would be contraindicated."[8] R. at 1.64. Therefore, according to the Medical Board, only those factors "which put undo anxiety and stress on an individual" should be avoided. As already noted, it was Davidson's burden to offer evidence showing that the recommended jobs would cause him stress. Even the Medical Board recognized that whether a particular job would cause Davidson too much stress would be based on *his* perception of the stress involved.[9] R. at 1.64. Yet, Davidson argues, in the abstract, that the recommended jobs are not in conformity with his medical restriction to avoid stress because the jobs have

---

[8] The System's "specialist," which recommended discontinuation of Davidson's benefits on May 6, 1997, interprets the Medical Board's report as stating that "while stress is determined largely on an individual basis certain circumstances, such as confrontations with clients, continuous phone calls or constant interruptions should be avoided." R. at 1.62.

[9] The Medical Board made the following conclusion:
A question has been raised as to how stress would be a limiting factor in this man's working at a sedentary occupation. The answer to that would *involve the perception of stress as seen by the individual himself.* Certainly, most people with this kind of condition as described above can tolerate light amounts of stress according to their perception. But once again *stress is in the eye of the beholder.*
R. at 1.64 (emphasis added).

15

elements which the Medical Board acknowledged can generate stress. He has put forth no evidence that those factors, in fact, would cause him stress. Without this evidence, he has not satisfied his burden of showing that he is unable to engage in substantial gainful employment. If he wanted to show that the recommended jobs were not consistent with his work restriction to avoid stress, then he needed to provide some evidence that those jobs would cause *him* stress. Having failed to do so, his appeal on this issue is without merit.

F. **Did the Board improperly consider Davidson's other unrelated medical conditions in reaching their decision?**

Davidson argues that the Board improperly considered his other medical conditions, which are unrelated to his heart condition,[10] in determining whether his heart condition prevented him from engaging in substantial gainful activity. The Board mentioned Davidson's other medical conditions three times in its decision. First, the Board noted that Davidson decided not to pursue a disability claim based on "peripheral neuropathy." R. at 39.3. Next, the Board found that there was nothing in the record that establishes a medical connection between Davidson's heart condition and the other medical conditions he suffers from. *Id.* Last, the Board concluded that Davidson's other medical conditions are not related to his heart condition, the condition for which he was awarded benefits. This conclusion was reached immediately after the Board noted the following regulation:

> A person shall be determined to be unable to engage in any substantial gainful activity if the person lacks the physical or mental capacity, *due*

---

[10] Davidson has conceded that this other medical conditions are unrelated to his heart condition. R. at 40.5-40.6.

*to the incapacity for which the person was awarded disability retirement benefits,* to perform or participate in any activity or activities, tasks or efforts that are or could be performed in such a manner as to generate remuneration in an amount which is consistent with average final compensation.

Me.S.Retirement Systems Rules ch. 507, § 1(A) (Sept. 28, 1993) (emphasis added).[11]

Considering the Board's statements in conjunction with this rule, it is apparent that the Board was merely finding that the evidence pertaining to Davidson's other medical conditions was irrelevant to its determination on whether Davidson was entitled to benefits because those conditions were unrelated to the condition for which he initially received benefits. Thus, the Board did not err in mentioning Davidson's other medical conditions in its decision.

### G.    Was Davidson provided adequate notice of the Board's meeting on March 11, 1999?

Davidson argues that he was not provided with sufficient notice of the Board of Trustees' meeting held on March 11, 1999. Pursuant to the Retirement System Rules, a claimant is entitled to make a statement of position not longer than 15 minutes before the Board but he may not present evidence. Me.S.Ret.Sys. R. ch. 702, § 15(C). Davidson argues that in order for a party to have a meaningful opportunity to make such a statement, due process requires that notice of the Board's meeting must be given sufficiently in advance to afford an adequate opportunity to prepare the statement. Additionally, he argues that to the extent that

---

[11] *See also Rodriques v. Maine State Retirement Sys.,* 1997 ME 56, ¶ 10, 691 A.2d 1205, 1207 ("[I]f a connection is established, a recipient of disability retirement benefits can continue to receive benefits on the basis of a limitation that arises from a condition related to the condition for which he was found to be incapacitated.").

the Board's meeting can be considered a hearing, he was entitled to written notice by regular mail pursuant to 5 M.R.S.A. §§ 9052(2)(A), (4) (1989). He argues that although he was notified on February 25, 1999 that the meeting would be held on March 11, 1999, he did not receive notice as to what time on the 25th his case would be heard until the day before the meeting. Because of this short notice, he claims that neither he nor his counsel were able to prepare for or attend the meeting of the Board. As a result, the decision was issued without the benefit of the statement allowed for in section 15(C) of the System's rules.

Pursuant to 5 M.R.S.A. § 17451 (1989), a claimant is entitled to appeal an adverse decision of the Executive Director to the Board of Trustees. This appeal is an adjudicatory proceeding subject to the requirements of the APA. *Id.* § 17451(1)(C). Pursuant to its rulemaking authority, 5 M.R.S.A. § 17103(4) (1989), the Board has established an appellate procedure in which a hearing officer may be appointed to hear the claimant's appeal. Me.S.Ret. Sys. R. ch. 702, § 8(A). This procedure was utilized in the instant case. The hearing officer held four prehearing conferences with the parties before conducting the hearing on Davidson's appeal on October 1, 1998.[12] At this hearing, Davidson, through counsel, presented evidence and testimony, and cross-examined the System's witness. Thereafter, the parties were given the opportunity to submit "position papers" after receipt of the hearing transcript, which Davidson did. The hearing officer then issued his recommended decision and pursuant to Me.S.Ret. Sys. R. ch. 702, § 14(B)(1), the parties were

---

[12] Davidson does not challenge the adequacy of the notice he received for the October 1, 1998 hearing before the hearing officer.

18

allowed to submit written comments on the decision. Davidson also took advantage of this opportunity to present argument. When the hearing officer's response to Davidson's comments was mailed to Davidson's counsel, he was notified that the Board would consider the recommended decision at its next meeting on March 11, 1999. At that meeting, the Board adopted the hearing officer's recommended decision. This entire procedure is part of a single appellate process and taken in its totality, it is apparent that the requirements of the APA, including the notice provisions, were complied with by the System.

Davidson also asserts that the notice he received regarding the March 11th hearing was constitutionally deficient. "Due process is a flexible concept calling for 'such procedural protections as the particular situation demands.'" *In re Kristy Y.*, 2000 ME 98, ¶ 6, -- A.2d -- (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)). Due process requires fundamental fairness, which involves consideration of three factors in assessing whether an individual's right to due process has been violated:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and administrative burdens that the additional or substitute procedural requirement would entail.

*Balian v. Board of Licensure in Medicine*, 1999 ME 8, ¶ 10, 722 A.2d 364, 367 (quoting *Mathews v. Eldridge*, 424 U.S. at 335 (1976)).

These factors weigh in favor of the System. While there is an important private interest at stake, the continuation of disability benefits, the risk of erroneous deprivation under the System's current procedures is minimal. Davidson was

19

given multiple opportunities to be heard throughout the appellate process. By the time his appeal had arrived before the Board, he had already participated in four prehearing conferences, as well as a full hearing in which he was given the opportunity to present evidence and witnesses, to testify, and to cross-examine the System's witnesses. After that hearing, he was able to submit written arguments and still further, he was given the opportunity to submitted written comments on the hearing officer's recommended decision. Finally, he was told that the Board would consider his case at its March 11, 1999 meeting. Providing a claimant with the specific time at which the Board will consider his appeal, under these circumstances, would do nothing to reduce the already minimal risk of erroneous deprivation. The System's appellate procedures are more than sufficient to protect the claimant's interest which is at stake.

This court also finds that Davidson did not suffer any prejudice or surprise as the result of being advised of the time at which he case would be considered on the day before the meeting. Davidson and his counsel were both aware that the case would be considered by the Board on March 11th. This, in and of itself, is enough notice to allow both of them to prepare for and attend the meeting. That they did not know the exact hour when the case would be considered, does not change the fact that they knew that their case would be considered on the 11th and that they should have planned accordingly. It strains credibility to suggest that because they did not know the time at which their case would be considered, they could not prepare for the meeting. Additionally, this court finds that although Davidson was

20

not able to make his statement before the Board, he was not deprived of his right to be heard considering the extensive appellate procedures which gave him the opportunity to present evidence and his arguments.

## III. Conclusion

Therefore, for all the reasons above, the entry shall be:

Petitioner's appeal is DENIED.

Dated: June 2, 2000

Donald H. Marden
Justice, Superior Court

Date Filed __8/20/99__     __Kennebec__          Docket No. __AP99-64__
                          County

Action __Petition for review__

DONALD L. GARBRECHT
LAW LIBRARY

JUN 9 2000

**J. MARDEN**

Robert N Davidson                    vs. Maine State Retirement System

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Christopher J Cotnoir Esq<br>PO Box 376<br>Waterville  Me  04903 | William H. Laubenstein, III, Esq.  AAG<br>6 State House Station<br>Augusta, Maine 04333-0006 |

| Date of Entry | |
|---|---|
| 8/20/99 | Petition for review of final agency action (M.R. Civ.P. 80C) filed. s/Cotnoir,Esq. |
| 8/25/99 | Letter entering appearance, filed. s/Laubenstein, III, Esq. |
| 9/22/99 | Certified record filed.  s/Laubenstein III AAG<br>**(FILED IN VAULT DRAWER)** |
| 9/22/99 | Notice of briefing schedule mailed to attys of record. |
| 11/1/99 | Brief of Petitioner Robert Davidson, filed. s/Cotnoir, Esq. |
| 11/10/99 | Documents that were omitted from the original certification of record filed.  s/Laubenstein III AAG<br>Pages 8.2 and 9.3 of the administrative record that were omitted filed. s/Laubenstein,III AAG |
| 12/3/99 | Brief of respondent Maine State Retirement System filed.  s/Laubenstein, III AAG |
| 12/16/99 | Motion for Enlargement of Time, filed. s/Cotnoir, Esq.<br>Proposed Order, filed. |
| 12/20/99 | ORDER OF ENLARGEMENT, Marden, J.<br>Appellant shall file his reply brief on or before December 29, 1999.<br>Copies mailed to attys of record. |
| 12/29/99 | Reply Brief of Petitioner Robert Davidson, filed. s/Cotnoir, Esq. |
| 3/9/00 | Oral argument had with Justice Marden presiding, Attys. Cotnoir and Laubenstein present.<br>Court takes under advisement. |
| 6/5/00 | DECISION AND ORDER, Marden, J. (dated 6/2/00)<br>Petitioner's appeal is DENIED.<br>Copies mailed to attys of record.<br>Copies mailed to Deborah Firestone, Garbrecht Law Library and Donald Goss.<br>Notice of removal of record mailed. |