STATE OF MAINE                                    SUPERIOR COURT
                                                  CIVIL ACTION
KENNEBEC, ss.                                     DOCKET NO. AP-06-72
                                                  DHM -KE N- 669/03

ROBERT and PATRICIA NELSON,

          Petitioners

     v.                                           **DECISION AND ORDER**

MAINE LAND USE REGULATION
COMMISSION,

          Respondent


Robert and Patricia Nelson ("Petitioners"), pursuant to M.R. Civ. P. 80C and 5

M.R.S.A. § 11001, ask this court to review the September 6, 2006 decision of the Maine

Land Use Regulation Commission ("LURC") approving Bayroot, LLC's Application to

Amend Subdivision Plan for LURC Project No. 5 ("SP 5").

In 1972, LURC approved Brown Company's subdivision application, SP 5, with

conditions, for an area around Parmachenee Lake. The 19-lot subdivision was

approved as a camp lot lease program. The lease lots were dispersed throughout the

31,000-acre subdivision and provided outdoor enthusiasts with the opportunity to lease

lots in a remote wilderness area. In its 1972 decision, LURC disapproved Brown

Company's proposed location of four sites for the reason that the soil at those locations

was unsuitable for development.[1] LURC imposed, in Condition 2 of its decision, a duty

on the applicant to return to the Commission to obtain approval for new locations for

---

[1] "Soil types on sites 1, 3, 9, 13 and 14 are rated with severe to very severe limitations for the uses proposed." R. at 20, ¶ 10 Finding of Fact. "Certain sites have unsuitable soil types, and should be re-located, except possibly site 1." R. at 20, ¶ 15 Finding of Fact. Site 1 already had an existing camp on it and LURC allowed it to remain on the condition that it obtain a plumbing permit and certificate of inspection. R. at 20, Condition 3.

those sites. "The applicant shall relocate, *with Commission approval*, sites 3, 9, 13, and 14 to suitable soils." R. at 20, ¶ 2 Terms and Conditions. Subsequent to LURC's approval of SP 5, Brown Company leased ten of the nineteen sites. During the next 31 years, until Bayroot purchased SP 5, none of the remaining nine sites was improved, developed, or leased.

Since 1972, LURC has adopted further regulations that apply to the subdivision. LURC rezoned the shorefront (within 250 feet of the water) to a specially protected zone called the Great Pond Protection Sub-District (P-GP zone). Residential development without a special permit from LURC is prohibited in this zone. LURC has also adopted a provision that prohibits shorefront lots, regardless of the zone, from forming a contiguous strip longer than 1320 linear feet. Finally, LURC adopted a sunset provision providing for the expiration of permits for lots that had been neither "substantially started" nor "substantially completed" by October 1, 2004.[2]

In 2004, Bayroot, as landowner and successor to SP 5, sought an advisory ruling from the Commission asking certain questions regarding its rights and duties regarding the nine lots that were undeveloped and that they proposed to relocate. In response, the Commission's staff issued Advisory Ruling AR-04-39 ("Advisory Ruling"). Bayroot, treating the Advisory Ruling as "Commission approval," thereupon relocated and leased the four lots that Condition 2 of SP 5 mandated, as well as applied for an amendment to authorize relocating five additional lots (to increase by four the number of lots on the shorefront of Lake Parmacheenee). On September 7, 2006, LURC

---

[2] Bayroot disputes that Section 10.17 of the Commission's rules applies to subdivision permits. However, both the staff advisory opinion and the LURC decision "take the more conservative view that it applies to both [subdivision and development permits], and therefore the conditions and activities authorized by that permit had to be met by October 1, 2004." R. at 4, fn. 1. The court is satisfied that LURC's interpretation of this rule is reasonable and within its realm of expertise, therefore the court will defer to LURC's position.

approved Bayroot's application to relocate the five previously approved lots within the 31,000-acre project area subject to a number of conditions. On October 5, 2006, the petitioners filed a petition for review, asserting, among other arguments, that Bayroot failed to meet the October 2004 deadline for fulfilling the conditions affecting sites 3, 9, 13, and 14 in SP 5, therefore, the permit expired. Petitioners continue, arguing that without a valid permit, LURC could not subsequently authorize the relocation of five other lots within the subdivision pursuant to an amendment to the expired SP 5.[3]

When the decision of an administrative agency is appealed pursuant to M.R. Civ. P. 80C, this Court reviews the agency's decision directly for abuse of discretion, errors of law, or findings not supported by the evidence. *Centamore v. Dep't of Human Services*, 664 A.2d 369, 370 (Me. 1995). "An administrative decision will be sustained if, on the basis of the entire record before it, the agency could have fairly and reasonably found the facts as it did." *Seider v. Board of Exam'r of Psychologists*, 2000 ME 206 ¶ 9, 762 A.2d 551, 555 (Me. 2000) (citing *CWCO, Inc. v. Superintendent of Ins.*, 1997 ME 226, ¶ 6, 703 A.2d 1258, 1261 (Me. 1997)). In reviewing the decisions of an administrative agency, the Court should "not attempt to second-guess the agency on matters falling within its

---

[3] Bayroot argues that petitioners lack standing due to their failure to show they have suffered a "particularized injury" from the LURC decision that "adversely and directly affects [their] property, pecuniary or personal rights." *Anderson v. Swanson*, 534 A.2d 1286, 1288 (Me. 1987) (internal citations omitted). The court is satisfied that the petitioners, as leaseholders who own a residence in SP 5, have standing. Boiled down, this is what the essential dispute is between the parties. The petitioners, and others who leased property in SP 5, did so for a unique, rugged wilderness area where camps were spread out so as to keep the area in a more natural state. This is what LURC encouraged in 1972, when it followed a philosophy encouraging scattered development. Now however, LURC has changed its approach and believes that the impact on wilderness is better managed if done in a more concentrated area-more camps closer together puts the impact in just a few areas as opposed to 19 areas each with a little impact. This is a significant departure from what the agency followed in 1972 and the petitioner's expectations (and property value) of their wilderness camp are diminished if a large subdivision with a cluster of camps and its accompanying roads and construction is allowed to be built under a grandfathered amendment. While the petitioners may not be abutters in the traditional understanding of the word, the word can sometimes be "loosely used" in circumstances such as this. *Sahl v. Town of York*, 2000 ME 180, ¶ 9, 760 A.2d 266, 269. Further, the court believes that the petitioners, as property owners in the subdivision in question, have standing as abutters to question decisions regarding development of the subdivision that will impact their property.

realm of expertise" and the Court's review is limited to "determining whether the agency's conclusions are unreasonable, unjust or unlawful in light of the record." *Imagineering v. Superintendent of Ins.*, 593 A.2d 1050, 1053 (Me. 1991).

The burden of proof rests with the party seeking to overturn the agency's decision, and that party must prove that no competent evidence supports the Board's decision. *Seider*, 762 A.2d 551. "[Petitioner] must prove that no competent evidence supports the Board's decision and that the record compels a contrary conclusion." *Bischoff v. Board of Trustees*, 661 A.2d 167, 170 (Me. 1995).

Petitioners present the following arguments:

(1)    The Commission had no authority to review Bayroot's Application to Amend as Section 1.02(D) of its rules limits LURC's authority to amend subdivisions to no more than 10% of a subdivision development;

(2)    Under Section 10.17, the permits for the nine relocated lots had expired because they were not lawfully leased prior to 10.17's October 1, 2004 decision;

(3)    Even if the permits to the lots had not expired, none of the lots could be relocated to the shores of Lake Parmachenee as they were subdivision lots and thus prohibited in the P-GP zone;

(4)    The placement of the relocated lots on the shoreline, regardless of the shoreline's zoning classification, would unlawfully extend the subdivision lots in a contiguous line well beyond the 1320 linear foot limit set forth in Ch. 10.25,Q,3,b.

LURC asserts that the petitioners' first argument is patently wrong because they misread Chapter 1 of the Commission's rules.  Chapter 1 deals only with the establishment of a fee schedule for applications and petitions processed by LURC.  The "minor changes" defined in Chapter 1 are defined because under Part C Exceptions (2) minor changes are not assessed a fee.  The petitioners respond that 12 M.R.S.A. § 685-B

requires ALL subdivision amendment applications to pay a fee ("fees apply to **all** amendments except for minor changes to *building* permits." (emphasis added). Since this is not a building permit, petitioners argue that a fee must apply and therefore Chapter 1 cannot exist to merely distinguish between no fee minor changes to subdivision permits and fee required major changes (as LURC asserts) because section 685 requires the imposition of a fee for both minor and major amendments.

LURC responds that the petitioner takes section 685 out of context (as they do Chapter 1) because section 685-B(5) concerns *unilateral* amendments or modifications of a Commission permit and states that these unilateral actions without authorization are violations. Section 685-B does not apply to permit amendments that are voluntarily sought by the permit holder, as in this case. Further, LURC argues that nothing in the regulations or statutes cited by the petitioners supports their argument that the Commission only has authority to authorize amendments to permits affecting less than 10 percent of the original project. LURC asserts that it has, throughout its history, considered and issued amendments to permits in response to permit holders' requests. In fact, section 10.11 of LURC's rules contemplates amendments of previously permitted activities that have become non-conforming or grandfathered, such as the subdivision in question, which was previously authorized under SP5 but does not conform to LURC's current zoning scheme.

The court finds that LURC has the authority to promulgate regulations to enact statutory provisions such as Section 685-B, and even if section 685 can be interpreted as the petitioners' desire, it is entirely legitimate for an agency to enact a regulation stating that minor changes to permits other than building permits can also be done without a fee.

The court will next review petitioner's argument that Bayroot failed to meet the October 2004 deadline imposed under section 10.17 for meeting the conditions affecting the approved lots under SP 5. LURC notes that there is some doubt as to the applicability of this section to subdivision permits. All of the terms of section 10.17 apply to construction and related activities. SP 5, being a subdivision permit, authorizes only the division and conveyance of lots and not any construction activities upon those lots. Following issuance of SP5, any construction on the authorized lots required a separate building permit from the Commission. Nevertheless, the Commission decision and the Advisory Ruling take the view that section 10.17 applies to both development and subdivision, therefore the conditions and activities authorized by the permit would, under this interpretation, needed to have been met by October 1, 2004. As noted in footnote two, the court finds LURC's interpretation of the applicability of this rule reasonable.

Applying section 10.17, the Commission argues that the October 2004 deadline was met because it upheld its staff's advisory ruling that stated that the approved lots under SP 5 could be moved to areas having approved soils, provided that this relocation occurred by the October 2004 deadline. LURC argues that in issuing this advisory ruling, its staff relied upon evidence provided by Bayroot of satisfactory soils at the new site locations, and the Commission found that these sites were in fact relocated by the deadline.

Petitioners argue that the Commission's attempt at recharacterizing an advisory opinion as a staff decision is fatally flawed because (1) if the advisory ruling is construed as a "staff decision," then aggrieved parties have been denied their statutory right to appeal the staff decision to the Commission within 30 days, as that deadline passed in 2004 with no actual or constructive notice to the public; and (2) the advisory

ruling cannot, as a matter of fact, constitute "Commission approval" of the proposed sites because it recites *future* actions Bayroot must take before approval can be given. These stated future actions presume a second review to determine if those conditions were met ("Provided Bayroot completes and complies," "Provided all terms and conditions . . . are complied with"). In further support of their position that the Advisory Ruling was not a final determination, the petitioners note that the Advisory Ruling actually states that it "is an informal response and not a legal determination," clearly demonstrating to any reasonable person that the ruling was, as its name implies, advisory.

Petitioners' arguments on this point are compelling. The Commission has delegated to staff the authority to approve, approve with conditions, or disapprove all applications submitted pursuant to section 685-B that are *routine in nature and do not raise significant policy issues*. LURC's regulations state that staff can be delegated the authority to approve or disapprove applications only upon finding that the applications are of a routine nature, that its handling by the staff will eliminate a waiting period between completion of the staff work and the next Commission meeting, and that the nature of the application is such that it can be made by the staff by following the strict basis of the statutory criteria in section 685-B and the policies, standards and rules adopted by the Commission. LURC Reg., Ch. 3.02(A).

This presumes that the only decision LURC staff is authorized to make is one that any reasonable, disinterested person, reviewing the same laws and regulations, would be compelled to make. In other words, LURC staff can make decisions regarding applications only if the applications are routine in nature and can be disposed of by simply following the applicable laws and regulations. This case clearly does not involve a "routine" application that is without significant policy issues.

In addition, chapter 3.02(B) of LURC's regulations states that "[a]ny person aggrieved by a **decision** of the staff . . . has the right to review of that decision by the Commission. A request for such review must be made in writing within 30 days of the staff decision." However, reading the advisory opinion in the way LURC wishes completely divests the petitioners of their right to appeal to the full Commission. The court simply cannot accept an argument that an advisory ruling can constitute "Commission approval" due to the lack of adequate notice provided in the advisory ruling to potentially aggrieved parties who wish to have the Commission review the decision.

The nature of advisory opinions is to inform people the steps that need to be taken so that the correct regulatory process is understood and followed, resulting in less burdensome and more efficient work done so as to make the more formal, future decision-making process go smoother. Petitioners have convinced the court that LURC's decision to treat a staff advisory ruling as "Commission approval" is unreasonable. Likewise, Bayroot and LURC have failed to convince the court that an advisory opinion is anything other than what its name proclaims it to be. Bayroot and LURC's reasoning is further undermined by the clear language of the advisory opinion's first paragraph, which also demonstrates that no independent analysis was conducted by LURC: "[I]n providing our views on these matters, *we have relied entirely upon the facts as you have presented them to us.*" Even more convincing is the scope of advisory rulings as defined in LURC's regulations. According to LURC regulations chapter 4.02, staff may issue an advisory ruling with respect to the *applicability* of any statute, standard or rule administered by the Commission. Further, 4.02(2) states that an advisory ruling *shall not be binding on the Commission.* The court notes the lack of

any language indicating that an advisory ruling otherwise constitutes "Commission approval."[4]

LURC, as a regulatory body, is charged with overseeing the granting of permits, and it is not reasonable to believe that the Commission grants approval to applicants based on an advisory ruling with no requirement that evidence supporting the application be submitted and reviewed to demonstrate that in fact the advisory ruling was complied with. Advisory rulings are a blueprint for a person to follow if they wish to have a smooth application process, and the person can choose to follow the advice or not, with the understanding that if the advice is not followed, they will have to convince the agency their decision was appropriate. It is LURC's job to oversee and ensure compliance, and allowing applicants to self-police themselves is contrary to LURC's purpose.

An argument could be made that there was no permit or amendment for LURC to approve because SP 5 was already issued; all that needed to be done was to get soil approval for the new locations, which staff is competent to do without full Commission oversight. The court notes that Bayroot did submit soil data to LURC for the proposed new locations prior to the October deadline, and Bayroot asserted that the soil, under its analysis, was suitable. However there is no determination or analysis in the record by LURC (or its staff) *confirming* that the soil was indeed acceptable, or any finding that the new locations would not increase the extent of nonconformity, as section 10.11 requires. The LURC decision also states in paragraph 12, "In September of 2004,

---

[4] 5 M.R.S.A. § 9001 grants the authority to agencies to, upon request, make advisory rulings. It further states that an advisory ruling shall not be binding on the agency, except in one instance: provided that in any subsequent enforcement action *initiated by the agency*, justifiable reliance on the ruling shall be considered in mitigation of any penalty sought to be assessed. This action was not initiated by the agency, further supporting the proposition that the advisory ruling at issue in this case cannot reasonably be viewed as "Commission approval."

*Bayroot LLC informed* the Commission that it had complied with the terms and conditions of SP5, as clarified through" the Advisory Ruling. Further, *"According to the applicant,* as of September of 2004 all of the 19 approved sites . . . had been leased and remained currently under lease." Nothing, however, indicates that LURC performed its oversight role to confirm that the terms and conditions were complied with.[5]

This approach is in contrast to the analysis LURC conducted in the Commission decision to grant Bayroot's application to relocate five lots. As to that application, paragraph 30 under Review Comments details the extensive comments from a Maine State Soil Scientist regarding the soils in the areas proposed for development. However, as to the relocation of the four sites necessary to maintain SP 5, the Commission simply states in paragraph 1 of its conclusions that the applicant sought and obtained *Commission* approval for the relocation of the four sites to sites with suitable soils for development. The only *Commission* approval it points to is its staff advisory ruling. Even if the court were to credit the argument asserting that LURC staff had the authority to declare that the soil samples were suitable, and even if the court were to accept an argument that there was no application or permit being approved (just a condition of an already existing permit), the fact remains that based upon the record before the court, no soil was ever "approved" by LURC or its staff. The Advisory Ruling states that it was written merely to provide its views on the matter, based upon evidence submitted to it by the applicant, and LURC cannot point to any evidence in the record confirming that it performed its oversight duties to ensure that the soil samples were indeed "suitable," and as a result, issued its "approval."

---

[5] While the court does not have any reason to doubt the analysis of the soil samples submitted by Bayroot, it also does not have the expertise to make that determination. The court merely finds that LURC failed to make its own separate determination.

Finally, because the Court finds that these 4 lots were not properly relocated prior to October 2004, Bayroot's subsequent application to relocate 5 other lots[6] is vacated because Bayroot was only able to request that these sites be relocated on the condition that it was found to have possessed a valid permit. A valid permit only existed to the extent that all of the terms and conditions of the SP5 were complied with. This could only have been accomplished by first having properly relocated (as required by the original permit) the 4 sites discussed earlier. By the terms of the permit, the 4 lots had to be relocated to a site with suitable soil in order for the permit to remain valid, and LURC failed to fulfill its regulatory role and make the affirmative determination that the soils were indeed suitable.

In addition, the Advisory Ruling also stated that it recommended that Bayroot submit an application to amend SP 5 prior to October 1, 2004, to relocate the five other sites, which it did not do until seven months after the October deadline. Further, the use of the nine undeveloped lots needed to be "substantially started", defined by LURC staff as approved at their new locations and leased. It was only after Bayroot deemed itself to have been in compliance and moved the 4 lots by October 2004 that it could be seen as having substantially started and was then able to make a subsequent request that it be allowed to move the other 5 lots. Because the 4 lots were not "authorized by the Commission," the SP5 permit lapsed and Bayroot, should it wish, if it wishes to continue, must submit a petition to rezone the lakefront subject to the more stringent permitting requirements in effect today.

---

[6] The lots proposed to be relocated are Brown Company sites 10, 11, 17, 18, and 19.

As to the 5 other lots (relocation of which was not authorized by SP5), the Commission evaluated Bayroot's requested relocation of the Amendment Lots pursuant to section 10.11 of its rules. Commission rules allow a permit to be issued for relocations of nonconforming lots if the Commission finds compliance with its permit authorizing statute and the project will not adversely affect surrounding uses and resources and that there is no increase in the extent of nonconformity. The majority of the LURC decision deals directly with this request.

The Commission reviewed the permit application, received comments from other agencies, as well as comments from opponents of the application, and determined that Bayroot had demonstrated that the relocation of the 5 lots complied with its rules and other permitting requirements. The Commission found: (1) that the proposed relocation would concentrate the previously approved scattered development onto two shoreline areas in keeping with the Commission's current Comprehensive Land Use Plan[7]; (2) that the relocated lots would comply with the Commission's dimensional requirements; (3) that the relocated lots would have suitable soils; (4) that the relocated lots would be accessible by an existing road while the unrelocated lots would require construction of a new road; (5) that the proposed right-of-way to the relocated lots would provide adequate access; (6) that the relocated lots would have no adverse effect on water quality or fish and wildlife resources; (7) and that the proposal would otherwise comply with section 685-B(4). The Commission followed these conclusions

---

[7] Boiled down, this is what the essential dispute is between the parties. The petitioners, and other who leased camp-sites on this property did so for a unique, rugged wilderness area where camps were spread out so as to keep the area in a more natural state. This is what LURC encouraged in 1972, when it followed a philosophy encouraging scattered development. Now however, LURC has changed its approach and believes that the impact on wilderness is better managed if done in a more concentrated area-more camps closer together puts the impact in just a few areas as opposed to 19 areas each with a little impact. This is a significant departure from what the agency followed in 1972 and the petitioners' expectations (and property value) for a wilderness camp are diminished if, as they believe, a large subdivision with a cluster of camps is allowed to be built.

with 15 conditions to the permit amendment, designed to assure that the relocated lots would conform with the Commission's findings and requirements. LURC argues that this comprehensive analysis and decision approving the application should be given deference.

The petitioners main arguments are (1) that LURC could not relocate these lots into the prohibited shore zone and (2) that the lots as approved would extend along a contiguous line further than allowed.[8] LURC does not appear to argue these two specific points, instead relying on the thoroughness of the Commission's decision. An evaluation of the Commission decision shows that the decision specifically states under the review criteria that a subdivision is not allowed within the Great Pond Protection Sub-District[9] ("P-GP zone") and that there can be no increase in nonconformance. The decision's specific response to these criteria states the reasons (numbered 1-7 above) why it believes relocation is appropriate. The court notes, however, that as to relocating more sites into a P-GP zone, the Commission's reasoning is that relocation "will concentrate the previously approved development, scattered on the shoreline and to the south and north of Parmachenee Lake, onto two shoreline area of the lake in keeping with the Commission's development goals . . . which states that the Commission discourages growth that results in scattered and sprawling development patterns."

Concerning the physical location of the 5 lots prior to relocation. According to ¶ 9 of the decision, "[o]f the 19 sites approved by SP 5, 13 were proposed to have frontage on Parmachenee Lake, 2 had frontage on Rump Pond, and the remaining 4 were

---

[8] LURC and Bayroot argue that petitioners' argument concerning the lots extending in a contiguous line further than allowed was not argued below and cannot be raised here. Petitioners argue that they specifically argued to the Commission that the lots had to meet all of section 10's impact standards, which include the contiguous line requirement. The court finds that the petitioners sufficiently raised the issue of the lots having to comply with section 10's impact standards such that the issue could be raised on appeal.

[9] A Great Pond Zone applies to all areas within 250 feet of the normal high water mark around all lakes and ponds greater than 10 acres in size.

proposed to be located on the Magalloway River." Paragraph 6 clarifies the proposed relocation. "The applicant seeks to amend . . . SP 5 . . . to allow for the relocation of 5 previously approved, but as yet undeveloped lots for seasonal camp development. . . . The original proposal for SP 5 included 13 shorefront lots on Parmachenee Lake. The applicant's proposed relocation of 5 lots does not increase the total number of previously approved lots, **but does increase the number of shorefront lots on Parmachenee lake by 4**, eliminates 2 previously approved lots located at sensitive locations on the Magalloway River, and reduces the amount of road construction required to access the lots."

While the 1972 permit imagined that the sites would be waterfront, it authorized them on three different waterways. As the petitioners state, "[t]here is a substantial difference in impacts between the original site locations, and the proposed new locations. Bayroot's Amendment results in **17** sites being located on the direct shore frontage of the lake." LURC asserts, however, that the relocation of 4 more sites onto the lakeshore will not have an adverse impact and will otherwise conform with LURC's regulations. Further, the sites are being moved from one subdistrict with substantial limitations on development to another, therefore there is no real increase in nonconformity.

The entry will be:

The petition to vacate LURC's September 6, 2006 decision regarding Bayroot's application to amend SP-5 is GRANTED; this matter is REMANDED to LURC for further proceedings consistent with this decision and order.

Dated: 6 - 29-07

Donald H. Marden
Justice, Superior Court

Date Filed __10/6/06_____ ____Kennebec_____ Docket No. ___AP06-72_____
                                  County

Action _____Petition for Review_____
                      80C                                              J. MARDEN

____Robert & Patricia Nelson_____ VS. ____Maine Land Use Regulation Comm., et al____

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Peggy L. McGehee, Esq.<br>One Canal Plaza<br>PO Box 426<br>Portland, Maine  04112-0426 | William V. Ferdinand, Jr., Esq.(Bayroot)<br>Eaton Peabody<br>77 Sewall Street, Suite 3000<br>Augusta, ME  04330<br>– Dennis J. Harnish, AAG<br>6 State House Station<br>Augusta, Maine  04333-0006 |

| Date of Entry | |
|---|---|
| 10/5/06 | Petition for Review, filed. s/McGehee, Esq. |
| 10/12/06 | Entry of Appearance, filed.  s/Ferdinand, Jr., Esq. |
| 11/3/06 | Certification of Record, filed. s/Carroll, Dir. LURC   **(in vault)** |
| 11/13/06 | Notice of briefing schedule mailed to attys of record. |
| 12/13/06 | Plaintiffs' Brief in Support of Petition, filed.  s/McGehee, Esq. |
| 12/15/06 | Plaintiffs' Amended Brief in Support of Petition, filed.  s/McGehee, Esq. |
| 12/20/06 | Respondent Maine Land Use Regulation Commission's Motion for Enlargement of Time in Which to File Brief, filed. s/Harnish, AAG<br>Proposed Order, filed. |
| 1/5/07 | Third Party-in-Interest Bayroot, LLC's Motion for Enlargement of Time in Which to File Brief, filed. s/Ferdinand, Jr., Esq.<br>Proposed Order, filed. |
| 1/22/07 | ORDER GRANTING ENLARGEMENT, Studstrup, J.<br>Bayroot LLC may file its brief on or before January 26, 2007.<br>Copies mailed to attys of record. |
| 1/22/07 | ORDER GRANTING ENLARGEMENT OF TIME, Studstrup, J.<br>Maine Land Use Regulation Commission may file its brief on or before January 26, 2007.<br>Copies mailed to attys of record. |
| 1/26/07 | Brief of Respondent Maine Lane Use Regulation Commission, filed. s/Pidot,AA<br><br>Brief of Bayroot, LLC Third Party in Interest, filed. s/Ferdinand, Jr., Esq |

Notice of scheduling for____3/9/07_____

sent to attorneys of record.

| Date of Entry | Docket No. _____ |
|---|---|
| 2/12/07 | Petitioners' Brief In Reply To Bayroot's Rule 80C Brief, filed. s/McGehee, Esq.<br>Petitioners' Reply To Maine Land Use Regulation Commission's Rule 80C Brief, filed.  s/McGehee, Esq. |
| 7/12/07 | DECISION AND ORDER, Marden, J. (6/29/07)<br>the petition to vacate LURC's September 6, 2006 decision regarding Bayroot's application to amend SP-5 is GRANTED;this matter is REMANDED to LURC for further proceedings consistent with this decision and order.<br>Copies mailed to attys. of record.<br>Copies mailed to Donald Goss, Garbrecht Law Library and Deborah Firestone. |