703 A.2d 1258 (1997)
1997 ME 226
CWCO, INC., et al.
v.
SUPERINTENDENT OF INSURANCE, et al.
Supreme Judicial Court of Maine.
Argued October 10, 1997.
Decided December 1, 1997.
*1259 Thomas V. Laprade (orally), John Lambert, Lambert, Coffin, Rudman & Coffin, Portland, for plaintiffs.
Andrew Ketterer, Attorney General, Jeffrey Frankel, Asst. Atty. Gen. (orally), Augusta, for the Superintendent.
James D. Poliquin (orally), Norman, Hanson & DeTroy, Portland, for MEMIC.
Mark B. LuDuc, Preti, Flaherty, Beliveau & Pachios, L.L.C., Augusta, for NCCI.
Before WATHEN, C.J., and ROBERTS, CLIFFORD, RUDMAN and LIPEZ, JJ.
CLIFFORD, Justice.
[¶ 1] CWCO, Inc. and Commercial Welding, Inc. appeal from a judgment of the Superior Court (Kennebec County, Mills, J.) affirming in substantial part a decision rendered by the Superintendent of Insurance.[1] The Superintendent concluded that Maine Employers Mutual Insurance Company (MEMIC) had properly combined the loss experience of CWCO and Commercial Welding in determining the premiums for their workers' compensation insurance. The companies contend that the Superintendent's decision combining their loss histories unfairly results in their paying excessive premiums. Because the factual findings of the Superintendent compel a conclusion that the companies had common majority ownership at the time when the loss experiences were determined, and the applicable statutory law and administrative rules provide for combining the experience of companies with common majority ownership in setting workers' compensation insurance rates, we affirm the judgment.
*1260 [¶ 2] Commercial Welding is a South Portland construction company that as of January 1, 1993 had not done business outside of Maine. CWCO, Inc. is a Georgia construction company and did not do any business in Maine until 1993. Prior to 1993, both CWCO and Commercial Welding were entirely owned by Lauren Engineers & Construction, Inc. Lauren, in turn, was owned 88% by Cleve Whitener and 12% by Michael Breed. A projected increase in Commercial Welding's experience rating modification factor,[2] or "mod," for 1993 from 1.00 to 2.63 was going to result in a substantial increase in its workers' compensation premiums and threaten the economic viability of the business. In order to avoid the increase in premiums, Commercial Welding subcontracted with CWCO so that CWCO would perform all of Commercial Welding's labor contracts for a one-year period, and the workers' compensation premiums would be based on CWCO's much lower mod of 1.00.[3]
[¶ 3] Although technically CWCO hired "new" craft labor employees from the union hall, the effect of the subcontract was to move the entire Commercial Welding payroll (including hourly paid and salaried employees) to CWCO on a shared computer system, without changing the employees' duties or work locations and merely having each employee sign a new hire form and a new W-2. Only Breed remained on Commercial Welding's payroll. CWCO obtained its workers' compensation policy on January 14, 1993 from appellee MEMIC, with its premiums being based on CWCO's mod of 1.00, and Commercial Welding then canceled its insurance.
[¶ 4] On its application for workers' compensation insurance, and in other documentation, CWCO represented that it was a new business and did not disclose its relationship through majority ownership to Commercial Welding. MEMIC's inquiries into CWCO's corporate structure, however, led it to conclude in May 1993 that CWCO and Commercial should have their loss histories combined because of common ownership and operation. Accordingly, as a result of the combining of the loss histories, CWCO's mod increased to 2.63 based on its combined history with Commercial Welding, and MEMIC recalculated a substantially higher premium for CWCO's insurance. MEMIC also ultimately concluded that the loss histories of Commercial Welding and CWCO were to be combined for purposes of Commercial Welding's insurance premiums when Commercial Welding applied for insurance in July, 1993.[4]
[¶ 5] The Superintendent denied CWCO's and Commercial Welding's requests to reverse MEMIC's decisions to combine the loss histories raising the mods that resulted in the increased premiums. Following denials of motions for stay and for reconsideration, the companies appealed the Superintendent's decision to the Superior Court pursuant to 24-A M.R.S.A. § 236 (1990), 5 M.R.S.A. §§ 11001-11007 (1989) and M.R. Civ. P. 80C. The court affirmed the bulk of the Superintendent's decision,[5] and this appeal followed. See 5 M.R.S.A. § 11008 (1989).
*1261 [¶ 6] When a decision of an administrative agency is challenged on appeal, we review the action of the agency directly. See Nyer v. Maine Unemployment Ins. Comm'n, 601 A.2d 626, 627 (Me.1992). An administrative decision will be sustained if, on the basis of the entire record before it, the agency could have fairly and reasonably found the facts as it did. See Aviation Oil Co. v. Department of Envtl. Protection, 584 A.2d 611, 614 (Me.1990). The issue before us is not whether we would have reached the same conclusion as the agency, "but whether the record contains competent and substantial evidence that supports the result reached . . . ." In re Maine Clean Fuels, Inc., 310 A.2d 736, 741 (Me.1973). Special deference is due when the issues subject to review lie within the scope of the agency's technical expertise. See Maine AFL-CIO v. Superintendent of Ins., 595 A.2d 424, 429 (Me.1991) (agency's interpretation of technical statutes and regulations given due consideration).

I.
[¶ 7] Workers' compensation insurers are required to "adhere to a uniform classification system and uniform experience rating plan." 24-A M.R.S.A. § 2382-B (Pamph. 1996). Workers' compensation insurance premiums are determined based on the experience rating of the insured, and the experience rating is, in turn, based on the insured's safety record. See 24-A M.R.S.A. § 2381-C(4). Title 24-A M.R.S.A. § 2382-D(1)(D) (Pamph.1996) requires that the experience plan used to rate companies for workers' compensation insurance premiums contain "[p]rovisions for reasonable and equitable limitations on the ability of policyholders to avoid the impact of past adverse claims experience through change of ownership, control, management or operation." The Maine Experience Rating Plan, Part III provides in relevant part:
A. COMBINATION OF ENTITIES
1. The combination of two or more entities for purposes of this Plan requires common majority ownership. Two or more entities shall be combined only if:
a. the same person, group or persons or corporation owns more than 50% of each entity.
[¶ 8] In upholding the premiums assessed by MEMIC and based on the combined experience rating of CWCO and Commercial Welding, the Superintendent concluded that the companies' histories were combinable on the basis of common majority ownership. CWCO and Commercial Welding argue that the Superintendent erred in his conclusion that their histories were combinable because, they contend, they changed the corporate structure of CWCO and Commercial Welding, eliminating common majority ownership effective January 1, 1993. They claim this was accomplished by oral agreements, and evidenced by the execution of documents in mid-1993 that were effective January 1, 1993. The documents reflect that Breed redeemed his interest in Lauren and that Breed purchased 80% of Lauren's interest in Commercial Welding. This left Breed with no ownership in Lauren, and Lauren with a 20% ownership in Commercial Welding. The companies contend, therefore, that there was no common majority ownership within the meaning of Part III of the rating plan, and that CWCO and Commercial Welding were separate and should have been treated separately for purposes of their experience ratings in January, 1993.[6] We disagree.
[¶ 9] The Superintendent found that the restructuring of CWCO and Commercial Welding that the companies contend was effective *1262 in January, 1993, in fact did not take place until August of 1993. The finding is well supported in the evidence. Although the companies claim that Breed resigned as president of CWCO on December 31, 1992, as part of the transfer, later-dated documents listed him as president, including the Corporation's annual report filed with the Secretary of State on March 29, 1993. There is no documentation of any activity pertaining to the restructuring prior to May, 1993. The stock purchase agreement and redemption agreement were executed in June 1993 or later, to be effective January 1, 1993. The stock share transfer did not take place until August, 1993, and Breed did not pay for his shares in Lauren until late August, 1993. The certificates of capital stock were issued in December, 1993. Although the companies presented evidence of an oral agreement to change the corporate structure on or before January 1, 1993, the Superintendent was justified in relying on the documentary evidence that substantially contradicted the self-serving testimony of the companies' witnesses to conclude that the transactions did not take place until much later.
[¶ 10] The companies argue that because the Superintendent's finding that the restructuring did not occur until August of 1993 was unnecessary to his decision,[7] it should not be relied on to conclude that the histories of CWCO and Commercial Welding are combinable because of common majority ownership. We disagree.
[¶ 11] Although the Superintendent did state that the date of the sale accomplishing the restructuring was not critical to his decision, he nevertheless clearly concluded that the ownership of the companies did not change prior to August of 1993. On the date of the issuance of CWCO's policy, January 14, 1993, Lauren owned more than 50% of each of the two companies. The same ownership existed in July of 1993, when Commercial Welding's policy was issued. Pursuant to the Maine Experience Rating Plan their loss histories were clearly combinable and based on the experience rating mod of the combined companies, the insurance premiums were correctly assessed. See Oliver v. Secretary of State, 489 A.2d 520, 524 n. 4 (Me.1985) (decision below will be affirmed on appeal if its ultimate conclusion is correct in law).

II.
[¶ 12] The companies also contend that MEMIC's adjustments of the experience rating modification factor came too late, in violation of Chapter 450 of the Bureau of Insurance Rules, and that MEMIC is estopped from increasing the premiums because the companies relied on the initial lower mods.
[¶ 13] Chapter 450 of the Bureau of Insurance Rules implementing the rating system provides:
§ 2. Effective date of experience rating modification
B. Limitation. An insurer shall not implement an increase in the experience rating modification factor more than 90 days after the policy effective date. An insurer or rating organization may appeal to the Superintendent for an extension of the 90-day limitation period if there are unusual circumstances which legitimately delay the availability of the experience modification factor.

D. Lack of employer cooperation. The restrictions, in subsections A and B above shall not apply if the rating organization is unable to calculate the modification factor for an employer solely because the employer has failed to cooperate in an audit affecting the modification calculation or solely due to the fault of the employer or an agent of the employer.
(Emphasis added).
[¶ 14] The policy for CWCO became effective on January 14, 1993. It wasn't until May 24, 1993 that MEMIC notified CWCO that its experience rating was being combined with Commercial Welding and that the premium would increase. The Superintendent relied on section 2(B) of Chapter 450 to determine that unusual circumstances made it unfair to restrict MEMIC to the 90 day limit because CWCO had not provided MEMIC with accurate information. Even though MEMIC had not filed a formal appeal, *1263 the fact that CWCO misrepresented to MEMIC that it was not related through common majority ownership to any entity, and that MEMIC did not discover the actual common ownership circumstances until much later, justifies the Superintendent's action. See In re Maine Clean Fuels, Inc., 310 A.2d 736, 744 (Me.1973) (administrative agency has inherent power to alter its administrative rules when necessary or helpful to achieve objectives and purposes of agency).
[¶ 15] MEMIC's request to the Superintendent to suspend the 90-day limit on policy increases as to the Commercial Welding policy was made more than 90 days after the effective date of the policy. A hearing was held within the 90 day period before the Maine Appeals Board, however, to determine that additional information was needed before making a determination on the mod for Commercial Welding, and MEMIC had requested a ruling from NCCI on the increase within the 90 days. The Superintendent found that Commercial Welding had sufficient notice that there was a dispute about the issue and the 90 day rule could be suspended. That ruling was within the discretion of the Superintendent. See Sabattus School Committee v. Department of Education, 644 A.2d 1380, 1382 (Me.1994) (agency entitled to considerable deference in interpretation of its own regulations).
[¶ 16] Moreover, MEMIC is not estopped from increasing the mod factors and the premiums in either case. CWCO, because of its conduct in withholding information concerning its common majority ownership, cannot successfully contend that MEMIC should be estopped from increasing the rating modification factor applied to CWCO. Because Commercial Welding was fully aware of the issue of common ownership and whether the experience ratings of CWCO and Commercial Welding should be combined within 90 days of the effective date of its policy, MEMIC is not estopped from seeking relief from the 90 day rule in regard to the experience rating used for Commercial Welding.
The entry is:
Judgment affirmed.
NOTES
[1] Other defendants in this action are Maine Employers Mutual Insurance Company (MEMIC) and the National Council of Compensation Insurance (NCCI). NCCI did not file a brief since its position overlapped with that of the Superintendent and MEMIC, and because NCCI's calculation of the experience ratings has not been challenged on appeal.
[2] Experience rating modification factors are assigned by the National Council on Compensation Insurance (NCCI) based on whether a company's past losses make it a better or worse-than-average risk for future losses. A company's mod is multiplied by the basic workers' compensation premium to arrive at the company's estimated and final premiums. A mod of 1.00 results in no adjustment, while a mod of 2.63 nearly triples the resulting premium. See Maine Workers' Compensation Experience Rating Plan at p. 2; 24-A M.R.S.A. § 2382-B (Supp.1996) (requiring all insurers to adhere to a uniform rating plan designated by the superintendent).
[3] CWCO appeared to qualify for a low mod because it had never done business in Maine and thus had no accident history.
[4] Later in 1993 CWCO transferred the salaried and other managerial employees back to Commercial Welding, and Commercial Welding applied for its own insurance. Presumably because Commercial Welding had no employees in the first half of 1993, NCCI initially ruled that Commercial Welding would have a mod of 1.00 until it had sufficient history to receive its own experience rating. MEMIC again determined that the experience ratings of Commercial Welding should be combined with CWCO for purposes of setting premiums. After further investigation, NCCI subsequently determined that since Commercial Welding never actually underwent a significant change in operation, its past history and higher mod should apply. That decision also was upheld by the Superintendent.
[5] The Superior Court vacated as premature a paragraph in the Superintendent's decision that authorized MEMIC to cancel the companies' policies if they did not pay the required premiums. That part of the Superior Court's judgment is not challenged on appeal.
[6] The Superintendent concluded that Whitener, Breed, and the Lauren holding company constituted a "group of persons" pursuant to Part III(A)(1)(a) of the Plan even after Breed's purchase of the 80% share of Commercial Welding stock. The Superintendent also approved the combining of the rate experience of CWCO and Commercial Welding on the separate basis that the companies' loss histories were combinable because their relationship constituted an employee leasing arrangement pursuant to 32 M.R.S.A. §§ 14051-14058 (Supp.1995) and Maine Insurance Rule, Chapter 560 (Nov. 1, 1992). Because we conclude that the experience ratings were properly combined, albeit on different grounds, we need not address either ground relied on by the Superintendent.
[7] See n. 6 supra.