ENTERED DEC 0 9 2014

STATE OF MAINE
KENNEBEC, SS.

SUPERIOR COURT
LOCATION: Augusta
Docket No. AP-14-14
MMM-KEN-11-26-14

)
JAMES NICHOLS,                            )
                                          )
                  Petitioner,             )       **ORDER ON PETITIONER'S M.R. CIV.**
                                          )       **P. 80C APPEAL**
        v.                                )
                                          )
STATE OF MAINE DEPARTMENT OF              )
HEALTH & HUMAN SERVICES,                  )
                                          )
                  Respondent.             )
                                          )
                                          )

Petitioner James Nichols filed a M.R. Civ. P. 80C appeal challenging the Final

Decision by the Hearing Officer for the Department of Health and Human Services

("DHHS" or the "Department") affirming the involuntary discharge of Mr. Nichols on an

emergency basis by Richmond Elder Care ("REC"). The Decision upheld REC's

emergency involuntary discharge because it found Mr. Nichols posed a direct threat to

REC's residents. For the reasons discussed below, the Court affirms the Department's

Decision and denies Mr. Nichols' appeal.

## I.    . Background and Statement of Facts

Mr. Nichols is a 64 year-old recovering alcoholic with Post Traumatic Stress

Disorder ("PTSD"). *See* Record, Tab B, Hearing Transcript at 74:20-75:2. Mr. Nichols'

PTSD is due in part to physical abuse he suffered from his alcoholic father as a child.

Record, Tab A, 1/29/14 Final Decision ("Decision"), Finding of Fact ("FoF") 14-15; Tab

B, Hearing Transcript at 123:2-7. Mr. Nichols received clinical therapy for his PTSD

1

from Lynn Schwarz, a certified clinical nurse specialist in psychiatry and mental health. Hearing Transcript at 113:14.

Mr. Nichols was admitted to REC on or about May 1, 2013. Decision, FoF 1. REC is licensed as a private non-medical institution ("PNMI") Level IV under the Level IV PNMI Regulations. *See id.* at FoF 2. Upon his admission, Mr. Nichols was assigned to a room with another individual. *Id.* at FoF 4. This individual left REC and Mr. Nichols remained in his room without a roommate for approximately one week. *Id.* at FoF 5-6. Subsequently, Ms. Wagurak, REC's residential service coordinator, asked Mr. Nichols if he would move to another room at REC so that his room could be freed up for incoming residents. Hearing Transcript at 8:6-19. Mr. Nichols met with his proposed new roommate ("Roommate 2) and agreed to move into a new room with him. *Id.* at 8:6-9:4. On or about June 9, 2013, Mr. Nichols moved into said room. Decision, FoF 8.

Roommate 2 had a prescription that allowed him to drink two beers per day. *Id.* at FoF 9. Roommate 2 drank more than two beers a day. *Id.* at FoF 10. Roommate 2 regularly urinated in portable urine containers, which he was responsible for cleaning and emptying. *Id.* at FoF 11-12. Roommate 2 did not regularly clean and empty his urinal containers. *Id.* at FoF 13. Mr. Nichols subsequently explained that the air conditioner circulated the smell of urine and beer around the room. Hearing Transcript at 73:13-74:10. Mr. Nichols explained that this smell reminded him of his abusive upbringing. *Id.* On June 10, 2013, Mr. Nichols went back to his old room, which contained an empty bed, but was informed by REC staff that it was no longer his room. *See* Record, Tab Nichols 3, REC Progress Note p. 11, 3pm-11pm note.

On June 16, 2013, Mr. Nichols complained harshly to REC staff about Roommate 2's drinking and feared he was "being put in danger by being in the same room as [Roommate 2]" and that he "might 'snap'." Decision, FoF 16-17. Also on June 16, 2013, Mr. Nichols told REC staff that he would "break [Roommate 2's] fingers if [he] turned off the air conditioner in their room. *Id.* at FoF 18. REC staff asked Mr. Nichols to step away from his bed and stop yelling. Record, Tab Nichols 3, REC Progress Note 14. Mr. Nichols complied and laid down on his bed. *Id.* at 14. That same day, Mr. Nichols yelled at Roommate 2, "I am ordering you as a marine to dump your urinals you fucken [sic] pig and if you don't I will dump it on you. Now I have spoken do you understand?" *Id.*

Later on June 16, 2013, REC left messages for Tim Dogerty, Mr. Nichols' case manager regarding Mr. Nichols' behavior. Hearing Transcript at 128:13-129:6. Mr. Dogerty went to the facility the next day and spoke to Mr. Nichols. *Id.* Afterwards, he told Ms. Gibbs, the facility administrator, that Mr. Nichols needed to be moved to a different room. *Id.* Ms. Gibbs, however, informed Mr. Dogerty that there were no rooms available, as Mr. Nichols' previous room had been promised to somebody else. *Id.* at 130:9-5.

On June 18, 2013, Ms. Wagurak, transported Mr. Nichols to a regularly scheduled therapist appointment. Decision, FoF 24. During that session, Mr. Nichols expressed to his therapist, Ms. Schwartz, that he had been having homicidal thoughts regarding Roommate 2. Hearing Transcript at 111:9-112:9. In particular, Mr. Nichols reported he wanted to brutalize and beat up Roommate 2. *Id.* at 123:17-124:2. He stated that "jail

would be worth it just to deal with this situation." *Id.* Mr. Dogerty attended the aforementioned therapy session. Decision, FoF 26.

While the therapy session was underway, Ms. Wagurak waited by the car. *Id.* at FoF 27. Before the therapy session was complete, Mr. Dogerty told Ms. Wagurak that REC needed to move Mr. Nichols' room and informed her of Mr. Nichols' homicidal ideation. Hearing Transcript at 131:14-132:10. Mr. Dogerty also told Ms. Wagurak to talk to an administrator at REC about whether to take Mr. Nichols back to REC. *Id.* Mr. Dogerty expressed that he thought it was safe to take Mr. Nichols back as long as he didn't have to be in the same room as Roommate 2, but that if they were going to discharge Mr. Nichols, they had to send him to a hospital. *Id.* Ms. Wagurak did not think it was safe to first transport Mr. Nichols back to REC and then call 911 to take Mr. Nichols to the hospital. Decision, FoF 30.

Ms. Schwarz and Mr. Nichols subsequently came down to Ms. Wagurak's car. *Id.* at FoF 31. Mr. Nichols became agitated and Ms. Wagurak decided to call 911 because she felt threatened. *Id.* at FoF 32. Ms. Schwarz volunteered to drive Mr. Nichols to the hospital where he was admitted. *Id.* at FoF 33-34. Ms. Schwarz testified that she deemed it a social, not psychological emergency because there was nowhere for Mr. Nichols to go but the hospital since he could not return to the same room as Roommate 2. Hearing Transcript at 112:13-19. Ms. Schwarz believed Mr. Nichols would be ok as long as he was not in the same room as Roommate 2. *Id.*

On June 25, 2013, the hospital determined it would be safe to discharge Mr. Nichols to REC as long as he was not housed with Roommate 2. Decision, FoF 36. Ms.

Gibbs, however, told the hospital that Mr. Nichols could not come back to REC because he had "murderous thoughts." *Id.* at FoF 37.

Ms. Gibbs testified that Mr. Nichols' room could not be changed because nobody would room with him besides Roommate 2. Hearing Transcript at 54:7-55:13. Ms. Gibbs did not, however, ask people whether they would room with Mr. Nichols. *Id.* As a result of REC's involuntary discharge, Mr. Nichols ended up spending 98 days as a patient at the hospital until he was placed in a different assisted living facility. *Id.* at 78:14-18.

## A. Procedural History

On August 12, 2013, Mr. Nichols appealed REC's decision to involuntarily discharge him. Record, Tab HO-2. On November 25, 2013, an administrative hearing was held. Decision, p. 1. The issue to be determined by the Hearing Officer was:

> Did [REC] act as permitted under the DHHS Regulations Governing the Licensing and Functioning of Assisted Housing Programs when it sought to involuntarily discharge James Nichols on an emergency basis against his will.

*Id.* at p. 5.

## B. The Hearing Officer's Decision

On January 29, 2014, the Hearing Officer determined that there was evidence at the time of discharge that Mr. Nichols posed a direct threat to Roommate 2. *Id.* at p. 4. In particular, Mr. Nichols had threatened to break Roommate 2's fingers and pour urine over his head. *Id.* Mr. Nichols also disclosed a desire to pummel Roommate 2 and expressed that he did not care if he went to jail for his actions. *Id.* Accordingly, the Decision found REC had authority to involuntarily discharge Mr. Nichols for posing a direct threat to others. *Id.* at p. 4.

The Decision also found that Ms. Wagurak reasonably believed there were exigent circumstances to discharge Mr. Nichols because Mr. Dogerty had just informed her that Mr. Nichols needed to go to the hospital due to homicidal ideation. *Id.* at pp. 4-5. The Decision further noted that Ms. Wagurak felt threatened by Mr. Nichols after the therapy session because Mr. Nichols "said in a loud voice stepping toward [Ms. Wagurak]...'Take responsibility for your actions and decide.'" *Id.* at p. 5.

The Decision further determined that while Ms. Schwarz did not believe Mr. Nichols needed to be hospitalized for psychiatric reasons, the hospital saw Mr. Nichols fit for admission and found it appropriate for him to stay as an inpatient from June 18th until June 25th. *See id.*

Finally, the Decision concluded that while REC poorly executed the emergency discharge—because they never provided written notice even though they had sufficient time to do so and their communication to the hospital was "poor at best"—REC acted in a permissible manner under the Regulations because Mr. Nichols posed a direct threat to the residents of REC. *Id.*

On or about February 25, 2014, Mr. Nichols appealed the Decision pursuant to M.R. Civ. P. 80C.

## II. Discussion

### A. Standard of Review

The standard for reviewing the merits of an administrative agency decision is whether the agency abused its discretion, committed an error of law, or made factual findings not supported in the record. *Botting v. Dep't of Behavioral & Developmental Servs.*, 2003 ME 152, ¶ 9, 838 A.2d 1168; *Centamore v. Dep't of Human Servs.*, 664

6

A.2d 369, 370 (Me. 1995). When reviewing the decisions of an administrative agency, the Superior Court will not "second guess the agency on matters falling within its realm of expertise," and the Court's review is limited to "determining whether the agency's conclusions are unreasonable, unjust or unlawful in light of the record." *Imagineering v. Superintendent of Ins.*, 593 A.2d 1050, 1053 (Me. 1991).

"In reviewing an agency's interpretation of its own rules, regulations, or procedures, we give considerable deference to the agency and will not set aside the agency's interpretation unless the regulation or rule compels a contrary result." *Forest Ecology Network v. Land Use Regulation Comm'n*, 2012 ME 36, ¶ 28, 39 A.3d 74 (quoting *Nelson v. Bayroot, LLC*, 2008 ME 90, ¶ 17, 953 A.2d 378). The party attempting to vacate the agency's decision bears the burden of persuasion. *Id.* If the agency's decision was committed to the reasonable discretion of the agency, the party appealing has the burden of demonstrating that the agency abused its discretion in reaching the decision. *Id.* (citing *Sager v. Town of Bowdoinham*, 2004 ME 40, ¶ 11, 845 A.2d 567. "An abuse of discretion may be found where an appellant demonstrates that the decision maker exceeds the bounds of the reasonable choices available to it, considering the facts and circumstances of the particular case and the governing law." *Id.*

Furthermore, "[a]n administrative decision will be sustained if, on the basis of the entire record before it, the agency could have fairly and reasonably found the facts as it did." *Seider v. Bd. of Examiners of Psychologists*, 2000 ME 206, ¶ 9, 762 A.2d 551. "Judges may not substitute their judgment for that of the agency merely because the evidence could give rise to more than one result." *Gulick v. Bd. of Envtl. Prot.*, 452 A.2d 1202, 1209 (Me. 1982). "Inconsistent evidence will not render an agency decision

unsupported." *Seider*, 2000 ME 206, ¶ 9, 762 A.2d 551. The issue is not whether the court would have reached the same conclusion as the agency, "but whether the record contains competent and substantial evidence that supports the result reached...." *CWCO, Inc. v. Superintendent of Ins.*, 1997 ME 226, ¶ 6, 703 A.2d 1258 (Me. 1997) (quoting *In re Maine Clean Fuels, Inc.*, 310 A.2d 736, 741 (Me. 1973)). "The burden of proof rests with the party seeking to overturn the agency's decision...[to] prove that no competent evidence supports the...decision." *Seidor*, 2000 ME 206, ¶ 9, 762 A.2d 551.

### B. Whether the Hearing Officer Was Required to Interpret the Term "Direct Threat" Consistent with the Federal Fair Housing Act and Maine Human Rights Act

Mr. Nichols argues the term "direct threat" must be read in accordance with the federal regulations implementing the Fair Housing Act ("FHA") and the Maine Human Rights Act ("MHRA"). This would include a requirement to carry out a substantive individualized assessment regarding whether a direct threat actually exists. The Department counters that there is under no obligation to utilize the definition of "direct threat" in the FHA or MHRA or carry out a substantive individualized assessment as outlined in the FHA. The Department also argues that a plain reading of the term "direct threat" could reasonably include threats of violence and homicidal thoughts by a resident against another. Mr. Nichols responds that a substantive individualized assessment is required because absent that assessment PNMI Level IV facilities would have "virtually unchecked plenary authority...to remove a certain class of residents whenever they choose to by merely citing to what the resident said or thought." Pet.'s Reply Brief, p. 3.

Pursuant to section 205(2) and 206(3) of title 22-A, the Commissioner of Health and Human Services must establish such regulations as the Commissioner may determine

appropriate or necessary for the execution of the statutory purposes and functions of the institutions the Commissioner governs. Pursuant to this authority, the Commissioner adopted PNMI Level IV Regulations, which are intended, in pertinent part, to "encourage each resident's right to independence, choice and decision making, [sic] while living in a safe environment. 10-144 C.M.R. Ch. 113, § 1. The PNMI Level IV Regulations go on to provide that a facility may only discharge a resident against that resident's will for certain reasons, which include when "[a] resident's continued tenancy constitutes a direct threat to the health or safety of others[.]" *Id.* at § 5.3.2. The term "direct threat" is not defined in the PNMI Level IV Regulations. *See id.*

The regulations implementing the FHA, however, do define "direct threat," in pertinent part, as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services." 24 C.F.R. § 9.131(b). Section 9.131 further provides that:

> "In determining whether an individual poses a direct threat to the health or safety of others, the agency must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk.

*Id.* at § 9.131(c).

Similarly, the MHRA offers a definition of the term "direct threat" as "a significant risk to the health or safety of others that can not [sic] be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." 5 M.R.S.A. §§ 4592 (public accommodation); 4573-A-1 (employment).

9

Mr. Nichols supports his argument that the Level IV PNMI Regulations must define "direct threat" in accord with the FHA and MHRA by pointing out that they contain similar provisions regarding accommodations for individuals with disabilities:

> 5.26 Reasonable modifications and accommodations. To afford individuals with disabilities the opportunity to reside in an assisted living program, residential care facility or a private non-medical institution, the provider shall:
>
> ...
>> 5.26.2 Make reasonable accommodations in regulations, policies, practices or services, including permitting reasonable supplementary services to be brought into the facility/program. The provider is not required to make the accommodation, if it imposes an undue financial burden or results in a fundamental change in the program.

10-144 C.M.R. Ch. 113, § 5.3.26.2.

Here, while it would appear reasonable for the Hearing Officer to adopt an interpretation of "direct threat" in line with the FHA and MHRA, this does not mean the that interpretation must be adopted. This is because nothing in the FHA, MHRA, or Level IV PNMI Regulations compels the Hearing Officer to adopt such an interpretation. For example, section 16.19 of the PNMI Level IV Regulations, to which Mr. Nichols cites, provides that facilities shall comply with fair housing practices. 10-144 C.M.R. c. 113, §16.19. While that section notes that the regulations must comply with fair housing practices, the section addresses sanitation and physical plant requirements. *Id.* It does not somehow incorporate the definition of "direct threat" utilized in the FHA's regulations into section 5.3.2 of the PNMI Level IV Regulations.

Furthermore, because the term "direct threat" is not defined in the PNMI Level IV Regulations, and there is not requirement to adopt the definition of "direct threat"

10

advocated for by Mr. Nichols, there is no requirement that prior to involuntarily discharging Mr. Nichols, REC was required to carry out an:

> [I]ndividualized assessment based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether the reasonable modifications of policies, practices, or procedures will mitigate the risk."

Mr. Nichols' Brief, 17 (citing 24 C.F.R. § 9.131(c)). For the same reason, REC was not required to modify its policies, practices, procedures, or provide auxiliary aids or services to eliminate the "direct threat" posed by Mr. Nichols.

Instead, the Department—through the Hearing Officer—is required to adopt an interpretation of the term "direct threat" that does not exceed the bounds of reasonable choices available. *Forest Ecology Network v. Land Use Regulation Comm'n*, 2012 ME 36, ¶ 28, 39 A.3d 74. The Hearing Officer's interpretation of "direct threat" as including threats of violence and homicidal thoughts by one resident against another fits squarely within the reasonable choices available to her and aligns with the stated purpose of promoting a safe living environment. *See* 10-144 C.M.R. Ch. 113, § 1. Mr. Nichols' concern that the Hearing Officer's interpretation grants the Department "virtually unchecked plenary authority" is without merit as the interpretation is tied to threats of violence or homicidal thoughts expressed to others. Accordingly, the Hearing Officer did not abuse her discretion in interpreting the term "direct threat" in section 5.3.2 of the PNMI Level IV Regulations.

### C. Whether the Hearing Officer Abused her Discretion in Determining that Mr. Nichols Posed a "Direct Threat"

Based on the assumption that the term "direct threat" requires REC to carry out an individualized assessment in accord with the FHA and to modify its policies, practices, or

procedures to eliminate the direct threat in accord with the MHRA, Mr. Nichols raises three additional deficiencies with the Decision: 1) Ms. Gibbs acknowledged she did not review the hospital's records indicating Mr. Nichols was psychiatrically cleared to return to REC in determining Mr. Nichols was a direct threat; 2) Ms. Gibbs made no effort to determine whether arrangements could be made for Mr. Nichols to return to his old room—which was promised to, but not yet occupied by an incoming resident; and 3) Ms. Gibbs failed to ask whether anyone at the facility would agree to switch rooms with Mr. Nichols. *Id.* at 17-18.

The Department reiterates that the Hearing Officer was not required to adopt the definition of "direct threat" put forward by Mr. Nichols and that the determination that Mr. Nichols posed a "direct threat" was supported by competent and substantial evidence.

As discussed *supra* in section II(B), REC is not required to modify its policies, practices or procedures to eliminate a direct threat or conduct an individualized assessment, in accordance with the FHA, to determine if a direct threat exists. Instead, the Court reviews the Decision to determine whether competent and substantial evidence supports the finding that Mr. Nichols posed a direct threat as evidenced through threats of violence and/or homicidal thoughts. Although the Court is not unsympathetic towards Mr. Nichols' position, the Court's function is not to second-guess the Hearing Officer's Decision. *See Imagineering v. Superintendent of Ins.*, 593 A.2d at 1053.

Here, competent and substantial evidence supported the Hearing Officer's finding that Mr. Nichols posed a direct threat to the health or safety of others including that: 1) Mr. Nichols told REC staff he would break Roommate 2's fingers if he turned off the air conditioner (Record, Tab Nichols 3, REC Progress Note 14); 2) Mr. Nichols yelled at

Roommate 2, "I am ordering you as a marine to dump your urinals you fucken [sic] pig and if you don't I will dump it on you..." (*Id.*); 3) Mr. Nichols disclosed that he wanted to brutalize Roommate 2 and that he did not care if he went to jail because of his actions (Hearing Transcript, 123:17-124:7); 4) Mr. Nichols communicated homicidal ideation regarding Roommate 2 to Ms. Schwarz (*Id.*); 5) Mr. Dogerty communicated this information to Ms. Wagurak and opined that Mr. Nichols needed to go to the emergency room (*Id.* at 131:14-132:10); 6) emergency room personnel documented that Mr. Nichols "developed homicidal ideation towards his roommate, making threats toward him" and that "[h]e was brought to the ER because of decompensating psychiatric issues" (Records, Tab Nichols 1, MaineGeneral History and Physical Examination Notes, 1); 7) the hospital saw fit to admit Mr. Nichols and keep him as an inpatient until or about June 25, 2013 (*Id.* at 6); 8) Mr. Nichols exhibited confrontational, harassing, and threatening to others at REC beyond Roommate 2 (Record, Tab Nichols 3, 16, 17; Hearing Transcript: 13:9-:14:20); and 9) that there was no other room to place Mr. Nichols in REC. (*see* Hearing Transcript at 55:2-56:13). In light of this evidence, the fact that contrary evidence indicates REC could have made further efforts to find Mr. Nichols a new roommate or that the threat posed by Mr. Nichols could have been eliminated by finding him a new roommate does not render the Hearing Officer's factual findings unsupported or untrustworthy. *CWCO, Inc.*, 1997 ME 226, ¶ 6, 703 A.2d 1258. Accordingly, the Hearing Officer did not abuse her discretion in finding that Mr. Nichols posed a "direct threat."

### D. Whether the Hearing Officer Abused her Discretion in Finding Mr. Nichols was Properly Discharged on an Emergency Basis

Mr. Nichols argues the Hearing Officer found he was involuntarily discharged on June 25, 2013 and, as a result, his discharge was not an "emergency" basis because he did not pose an "imminent danger" to others at REC at the time of the discharge. The Department counters that the Hearing Officer found Mr. Nichols was involuntarily discharged on June 18, 2013, and that this was properly done on an emergency basis due to the threat Mr. Nichols posed to Roommate 2.

The PNMI Level IV Regulations require that a facility must provide adequate notice and documented evidence of strategies used to prevent an involuntary transfer or discharge. 10-144 C.M.R. Ch. 113, § 5.4. A resident may be discharged without following these rules, however, when the resident is discharged on an emergency basis. 10-144 C.M.R. Ch. 113, § 5.5. In particular, the regulations provide:

> When an emergency situation exists, no written notice is required, but such notice as is practical under the circumstances shall be given to the resident and/or resident's representative. The facility shall assist the resident…in locating an appropriate placement. Transfer to an acute hospital is not considered a placement and the obligation in regard to such assistance does not necessarily terminate.

*Id.* The regulations define "emergency" as:

> [E]ither those events that demonstrate that a resident has an urgent medical or psychological need, which requires immediate acute care treatment, poses imminent danger to other residents…

*Id.* at § 2.20.

Here, the Decision is unclear regarding the exact date on which Mr. Nichols was involuntarily discharged. The Decision indicates that Mr. Nichols was not involuntarily discharged until after he was transferred to the emergency room. Decision, 3 ("Once in

14

the hospital, the facility made the decision to discharge him on an emergency basis"). A hospital note to the charge nurse on Mr. Nichols' ward stated that Ms. Gibbs explained on June 25 that Mr. Nichols "was a resident until he had murderous thoughts and had to be removed." *Id.* at 5. The use of the past tense in explaining that Mr. Nichols *was* a resident indicates that REC had decided to involuntarily discharge Mr. Nichols before Ms. Gibbs' phone call on June 25, 2013. However, the Decision also noted that REC "poorly executed the emergency discharge" and that it "never provided a written notice to Mr. Nichols even though there were many opportunities to do so once he was admitted to the hospital." *Id.*

Accordingly, the question becomes whether the Hearing Officer could have properly found that Mr. Nichols was involuntarily discharged on an emergency basis when REC had "many opportunities" to provide Mr. Nichols written notice of his discharge. The Court must give considerable deference to an agency's interpretation of its own regulations and will not set aside an interpretation unless the rule or regulation plainly compels a contrary result. *Forest Ecology Network*, 2012 ME 36, ¶ 28, 39 A.3d 74.

Here, an interpretation of "emergency" excluding Mr. Nichols' situation is not plainly compelled by the definition of "emergency" in 10-144 C.M.R. Ch. 113, § 2.20. Section 2.20 provides, in pertinent part, that an emergency is present when "a resident has an urgent medical or psychological need, which requires immediate acute care treatment [or] poses imminent danger to other residents." Section 2.20's distinction between the need for "immediate" acute care treatment and "imminent" danger supports an interpretation that for emergencies based on a direct threat to others, the time within

which an emergency occurs may last longer than an emergency based on an urgent medical or psychological need. *Id.* This interpretation is further supported by the requirement that for non-emergency discharges the resident must "be provided with at least fifteen (15) days advance written notice" because it could be reasonably be interpreted to imply that an emergency discharge may be appropriate at any time where less than fifteen days notice is necessary to protect the health or safety of others. 10-144 C.M.R. Ch. 113, § 5.4. Accordingly, the Hearing Officer did not abuse her discretion in interpreting the term "emergency" as applying to Mr. Nichols' situation due to the threat he posed to Roommate 2.

## III. Conclusion

Under the deferential standard of review the Court is bound to apply to the administrative decisions of the Department, the Court finds that the Hearing Officer did not abuse her discretion by interpreting the term "direct threat" as including threats of violence and homicidal ideation. The FHA and MHRA did not compel the Hearing Officer to adopt a different interpretation. Similarly, the Hearing Officer did not abuse her discretion in interpreting the term "emergency" as applying to Mr. Nichols' situation in which he was involuntarily discharged sometime after his admission to the emergency room on June 18, but prior to MS. Gibbs' phone call on June 25. Finally, the Hearing Officer's determination that Mr. Nichols' posed a "direct threat" and needed to be dismissed on an "emergency basis" was supported by competent and substantial evidence.

Therefore, the entry will be: Petitioner's M.R. Civ. P. 80C Appeal is DENIED.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated: November 26, 2014

Michaela Murphy, Justice
Maine Superior Court

| Date Filed | 2/25/14 | Kennebec County | Docket No. AP-14-14 | F |
|---|---|---|---|---|

Action: <u>Petition for Review</u>
  80C

## J. Murphy

| James Nichols | VS. | State of Maine Department of Health and Human Services |
|---|---|---|

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Mark Joyce, Esq. <br> 24 Stone Street, Suite 204 <br> Augusta, ME 04330 | Renee Guignard, AAG <br> 6 State House Station <br> Augusta, ME 04333 |

Date of Entry

| 2/26/14 | Petition For Review Of Final Agency Action, filed 2/25/14. s/Joyce, Esq. |
|---|---|
| 3/3/14 | Entry of Appearance, filed. s/Guignard, AAG |
| 3/4/14 | Certified Mail Return Receipts, filed. s/Joyce, Esq. <br> - AG Janet Mills, delivered 2/27/14 (no signature). <br> - Alice Knapp, Esq., delivered 2/27/14 (signature illegible). <br> - DHHS Commissioner Mary Mayhew, delivered 2/27/14 (no signature). <br> - AG Janet Mills, delivered 3/3/14 (no signature). <br> - Alice Knapp, Esq., delivered 2//27/14 (signature illegible). <br> - DHHS Commissioner Mary Mayhew, delivered 3/3/14 (no signature). |
| 3/27/14 | Certified Record, filed. s/Guignard, AAG |
| 3/27/14 | Notice and Briefing Schedule issued. <br> Copy to Atty Joyce and AAG Guignard |
| 4/3/14 | Supplement to Certified Record, filed (4/2/14). s/Guignard, AAG |
| 5/6/14 | Petitioner's Brief For Review Of Final Agency Action, filed. s/Joyce, Esq. |
| 6/6/14 | Respondent's Brief, filed 6/5/14. s/Guignard, AAG |
| 6/20/14 | Petitioner's Reply Brief, filed 6/19/14. s/Joyce, Esq. |
| 6/20/14 | Oral argument scheduled for 9/3/14 at 1:00. <br> Notice of Hearing sent to Atty Joyce and AAG Guignard. |
| 9/3/14 | Oral argument held, J. Murphy presiding. Mark Joyce, Esq. and Renee Guignard, AAG. <br> Tape 1898, Index 1515-2150. <br> Under advisement. |

12/8/14        ORDER ON PETITIONER'S 80C APPEAL, Murphy, J.  (11/26/14)
               Petitioner's 80C Appeal is DENIED.
               Copy to Atty Joyce and AAG Guignard
               Copy to repositories

12/8/14        Notice of removal of Record sent to AAG Guignard